# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

INTERNATIONAL DESIGNER    )
TRANSITIONS, INC.,    )
    )
    Plaintiff,    )
    )
    v.    )    1:07CV781
    )
FAUS GROUP, INC.,    )
    )
    Defendant.    )

## MEMORANDUM OPINION AND ORDER

**SHARP, Magistrate Judge**

On July 27, 2009, the Court heard oral argument from counsel on the cross-motions for partial summary judgment filed by the parties (Docket Nos. 44 and 49), as well as a motion by Defendant Faus Group, Inc. ("Defendant" or "Faus") to exclude an expert report submitted on behalf of Plaintiff International Designer Transitions, Inc. ("Plaintiff" or "IDT") (Docket No. 53). At that time, the Court issued a bench order disposing of the latter motion, and it now enters its rulings on the pending cross-motions.[1]

---

[1] At oral argument, the Court declined to reach Faus' motion to exclude the report and testimony of IDT's expert witness on damages, Aaron J. Stai, in its present form, but granted Defendant leave to renew said motion, no later than 45 days before trial, as a motion *in limine*. Further, based on the parties' in-court representations that the many choice-of-law issues raised in the cross-motions were not outcome-determinative of summary judgment issues, the Court determined that it need not make specific rulings on those issues at this time; however, to assist in pre-trial preparations, the Court nonetheless directed counsel to file, no later than 45 days before trial, a stipulation on choice-of-law issues, or separate statements of position. Finally, the Court granted IDT leave to file an amendment to its complaint, within 20 days of the argument, to particularize certain of its claims in accordance with Fed. R. Civ. P. 9(b).

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2006, the parties entered into a Supply Agreement (the "Agreement") under which IDT agreed to manufacture and sell to Faus certain wood molding products, including "FasTrim" molding and quarter rounds made from various domestic and exotic woods. FasTrim is a system that offers five moldings in one package for laminate and hardwood floorings. The Agreement was executed to enable Faus to supply The Home Depot ("Home Depot") with wood moldings under a separate agreement between those parties. The Agreement was for an initial term of three years, with two renewable terms.

Pursuant to the Agreement, IDT promised not to manufacture any of the moldings covered by the Agreement for any party other than Faus, and Faus agreed not to purchase any such products from any party other than IDT. (Docket No. 46, Ex. 1, Supply Agreement §§ 2.2 and 2.3.) Further, Faus agreed to issue written purchase orders to IDT for wood moldings, which IDT would then confirm in writing. Specifically, the Agreement provided that:

> Faus will submit written purchase orders for Products to IDT from time to time (each a "Purchase Order"). IDT agrees to use its best efforts to accommodate any changes to a Purchase Order requested by Faus. Any such changes agreed upon will be documented by the [sic] Faus and IDT in writing. Within two business days of receipt thereof, IDT will provide confirmation (by telecopy or by telephone, promptly confirmed in writing) of any Purchase Order.

(Agreement § 3.2.)

The Agreement also provided that IDT would promptly bill Faus for products shipped and that Faus would pay for products it had received and accepted within 45 days of the date

-2-

of the invoice. Moreover, Section 6 of the Agreement, which specifically deals with, and

indeed is entitled, "Inventory," states that:

> IDT may, but is not required to, maintain finished inventory of the Products
> and Faus has the obligation to take delivery of all Products manufactured
> against confirmed Purchase Orders.

(Agreement § 6.)

On July 16, 2008, IDT filed its motion for partial summary judgment in this action,

requesting the Court to find that Faus breached the parties' contract as a matter of law by (1)

refusing to pay for goods it accepted, (2) wrongfully refusing to accept goods it ordered, and

(3) cancelling confirmed purchase orders without IDT's agreement. IDT claimed "actual

contract damages" of $1,666,681.00. Alternatively, IDT requested the Court to find that

Faus breached the parties' contract as a matter of law and that IDT be allowed to try its entire

contract damages to the jury along with the remainder of IDT's claims. (Docket No. 44.)

On that same date, July 16, 2008, Defendant filed its motion for partial summary

judgment. (Docket No. 49.) Faus asserted that there is no genuine issue of material fact as

to IDT's claims of fraudulent inducement, fraudulent representation, negligent

misrepresentation, or unfair competition, and that Faus is entitled to judgment as a matter of

law with respect to those claims. Faus further asserted that there is no genuine issue of

material fact as to Plaintiff's claim for breach of contract insofar as the claim relates to goods

that had not been manufactured at the time particular purchase orders were cancelled by

Faus, and that Faus is entitled to partial judgment with respect to this claim.

## DISCUSSION

In addressing the cross-motions for summary judgment, the Court will apply Georgia law to evaluate the contract claims at issue, as it is undisputed that the Agreement contains a choice-of-law clause dictating that it do so. Further, for the sake of simplicity, the Court will apply North Carolina law to evaluate the remaining tort claims, as IDT has maintained, at least in briefing, that such is the proper standard by which to judge those claims, and Faus stated at argument and in its briefs that it would not make an outcome-determinative difference at this juncture whether North Carolina or Georgia law were applied.

## A.    The Summary Judgment Standard of Review

A party is entitled to judgment as a matter of law upon a showing that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A genuine issue as to such facts exists if the evidence forecast is sufficient for a reasonable trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In evaluating a forecast of evidence on summary judgment review, the court must view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party.

If the moving party carries its burden, the nonmoving party must come forward with evidence showing more than some "metaphysical doubt" that genuine and material factual

-4-

issues exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), *cert. denied,* 481 U.S. 1029 (1987). A mere existence of a scintilla of evidence is insufficient to circumvent summary judgment. *Anderson*, 477 U.S. at 252. Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. *Id*. at 248-49. A trial is not necessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993).

B.   **Plaintiff's Motion for Partial Summary Judgment**

IDT contends that Faus breached the Supply Agreement between the parties by: (1) refusing to pay for goods Faus received and accepted; (1) wrongfully rejecting goods manufactured against confirmed purchase orders; and (3) cancelling confirmed purchase orders without IDT's agreement. For reasons set forth below, the Court determines that IDT's motion for summary judgment should be granted with regard to sub-claim (1) above, but denied as to sub-claims (2) and (3).

Under Georgia law, it is well settled that the "terms and phrases contained in a contract must be given their ordinary meaning." *See, e.g., Unified Gov't of Athens-Clarke County v. McCrary*, 280 Ga. 901, 903, 635 S.E.2d 150 (2006). Further, it is equally clear that "no construction is required or even permissible when the language employed by the parties in their contract is plain, unambiguous, and capable of only one reasonable interpretation." *Id*. (quoting *Wolverine Ins. Co. v. Jack Jordan, Inc.*, 213 Ga. 299, 302, 99

S.E.2d 95 (1957)). Moreover, "[i]n such an instance, the language used must be afforded its literal meaning and plain [or] ordinary words [must be] given their usual significance." *Id.* These "cardinal rules" of construction must be applied to every contract dispute. *See id.*

Section 3.2 of the Agreement addresses the matter of purchase orders and defines the parties respective rights and duties with regard to such orders. The Court considers this clause to be unambiguous and to mean precisely what it says. Under the plain terms of the Agreement, it is clear that confirmed purchase orders cannot be unilaterally changed by either party, but that Faus may request changes to confirmed purchase orders (including their cancellation), and that IDT is then obligated to use its "best efforts" to accommodate any such requested changes.

In briefing to the Court, IDT has correctly articulated that purchase orders, once confirmed, cannot be unilaterally changed or cancelled by Faus; however, Plaintiff's interpretation of the contract is incomplete to the extent it does not recognize its own contractual duty to "use its best efforts" to accommodate requested changes. Indeed, while Faus does not have a contractual right to unilaterally change or cancel a confirmed purchase order, it is clear that IDT has a duty to use its best efforts to accommodate any changes that Faus may request.

Faus' argument concerning the correct interpretation of the contract is somewhat farther afield. Defendant has argued that Section 6 of the Agreement is relevant to the parties' duty to perform with regard to confirmed purchase orders; however, by its

-6-

unambiguous terms, Section 6 relates to inventory, not to the changing or cancellation of purchase orders. Accordingly, the Court must reject this contention.[2]

Based on its reading of the unambiguous language of the Agreement, set forth above, the Court concludes that IDT's breach of contract sub-claims (2) and (3) are not grantable on summary judgment review. At this time, it is sufficient to say that sub-claims (2) and (3), which relate to confirmed purchase orders on which Faus gave notice of cancellation, are meritorious only if IDT can persuade a trier-of-fact that it used its "best efforts" to accommodate each request by Faus for cancellation, but could not do so, despite putting forth that qualified and quite particular level of effort. In this context, "best efforts" is quintessentially a fact question, reserved for the jury.

In point of fact, the Court's review of the factual record regarding the negotiations between the parties, the attempts of Faus to cancel confirmed purchase orders, and IDT's efforts, or lack thereof, to accommodate said requests, leaves the Court quite unable to find the absence of a genuine issue of material fact. While it is clear that the parties engaged in

---

[2] Section 6 states that IDT may, but is not required to, carry an inventory of finished goods, and that Faus must take delivery of all goods in inventory manufactured against confirmed purchase orders. Thus, it would seem that if IDT chooses to produce and carry an inventory of finished goods, whether supported by confirmed purchase orders or not, it may; however, if said goods are not supported by purchase orders, then the maintenance of the inventory is at IDT's risk, as it is apparent that Faus has not assumed any obligation to take delivery of products that were not manufactured against confirmed purchase orders. Thus, Section 6 is not inconsistent with, nor does it modify Section 3.2. In short, Section 6 has no relevance to the dispute being litigated in this action: issues here relate to rights and duties with respect to cancelling confirmed purchase orders, not to rights and duties with regard to inventory. This reading affords both §§ 3.2 and 6 their plain meaning without any untoward construction, whereas Defendant's interpretation would call for a construction where none is permitted, in order to manufacture a right where none exists.

negotiations concerning Faus' notices of cancellation, the Court cannot say, as a matter of law, that the record shows that IDT used its "best efforts" to accommodate said requests. That question must be put to the jury on IDT's breach of contract sub-claims (2) and (3).[3, 4]

On the other hand, the record is clear that IDT is entitled to summary judgment on sub-claim (1) – that Faus failed to pay the contract price for goods that Faus received and accepted. At oral argument, counsel for Faus conceded that there was a certain quantity of goods that IDT shipped under the Agreement, that Faus received and accepted, which the contract valued at $588,482.30, for which Faus never remitted payment. This conduct clearly violates Georgia's Uniform Commercial Code, which states, in relevant part, that: "[t]he buyer must pay at the contract price for any goods accepted." *See, e.g., Prudential Metal Supply Corp. v. Atl. Freight Sales Co.*, 204 Ga. App. 439, 440, 419 S.E.2d 520 (1992) (citing OCGA § 11-2-607(1)); *see also Contract Sales & Serv. Int'l, Inc. v. Am. Express Travel*

---

[3] At oral argument, counsel for IDT ventured his opinion that *both* parties used their "best efforts" to come to an agreement concerning Faus' cancellation notices. At face value, counsel's statement may appear to be a magnanimous gesture, characterizing the negotiation efforts of both parties to be "best efforts," despite the fact that they were ultimately unsuccessful; however, the Court observes that (1) the contract imposes the "best efforts" duty only on IDT, thereby making counsel's statement, which ostensibly covers both parties, entirely self-serving; and (2) while counsel is willing to recognize "best efforts" in post-contract negotiations by Faus (an irrelevant concession), IDT at the same time maintains claims of fraud and deceptive trade practices against Faus arising out of both the formation and operation of the Agreement, as well as in post-contract negotiations.

[4] The Court need not at this time address additional legal arguments made by the parties regarding either breach or damages with regard to sub-claims (2) and (3). Those matters are now reserved for trial. Important issues concerning the proper measure of contract damages can be briefed by the parties in final pretrial briefing and decided by the Court at trial.

-8-

*Related Servs. Co.*, 216 Ga. App. 61, 63, 453 S.E.2d 62 (1994). Thus, the Court finds that Faus has no factual or legal defense to this claim.

Accordingly, for reasons set forth above, IDT's motion for partial summary judgment is **GRANTED** as to its breach of contract sub-claim (1) (goods shipped and accepted), and **DENIED** as to sub-claims (2) and (3); moreover, the Court determines that IDT shall recover damages, calculated as of the date of its motion for partial summary judgment, in the amount of $588,482.30.[5]

## C.   Defendant's Motion for Partial Summary Judgment

In addition to opposing IDT's motion for partial summary judgment, Defendant Faus has filed its own cross-motion for summary judgment on IDT's tort claims and on IDT's breach of contract claim insofar as the latter relates to goods that had not been manufactured at the time particular purchase orders were cancelled by Faus.

As an initial matter, based on the Court's prior interpretation of §§ 3.2 and 6 of the Agreement, set forth above, Defendant's motion must be **DENIED** as it relates to IDT's contract claim. Section 3.2 of the Agreement deals with the placement and confirmation of purchase orders, as well as the process for making changes thereto. Section 6, which deals specifically with inventory and makes reference to the "manufacture" of products, has no relevance to said issues. Accordingly, Faus' argument that some products were not yet

---

[5] The $588,482.30 figure includes the principal due, along with contract interest and penalties, as of the time of filing of IDT's motion for summary judgment. Contract interest and penalties continue to accrue until the time of judgment in this matter.

manufactured when it gave notice of cancellation is simply irrelevant under the unambiguous terms of the Agreement; the legal effect of any putative cancellation by Faus is governed wholly by Section 3.2. Thus, while the timing of manufacture *vis a vis* the dates of putative notices of cancellation *may* have some significance under certain theories of damages, an issue which the Court need not decide at this time, it is irrelevant to the issue of breach presently before the Court.

Moving on to IDT's tort claims, the Court notes at the outset that claims arising out of a commercial relationship, which are, at bottom, essentially claims for breach of contract, do not generally give rise to tort liability. *See generally Strum v. Exxon Co., U.S.A.*, 15 F.3d 327, 332 (4th Cir. 1994); *see also Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345-47 (4th Cir. 1998). In the case at bar, Defendant has argued that Plaintiff's fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, and unfair and deceptive trade practice claims fail as a matter of law for this reason, as well as on several other grounds, including an asserted lack of particularity.

As alluded to above, the Court afforded Plaintiff an opportunity to remedy the latter of these perceived shortcomings. Plaintiff's tort claims are now "particularized" in its

complaint amendment, which was filed on August 7, 2009 (the "Rule 9 Amend.").[6]  (Docket

No. 75, Second Am. Complaint.)  In its Rule 9 Amendment, IDT alleges that:

(1)     As early as October, 2005, prior to the execution of the Agreement,

representatives of Faus made overtures about possibly acquiring IDT, if IDT would build a

new plant in Graham, North Carolina (Rule 9 Amend. ¶ 11).

(2)     In November and December of 2005, further conversations transpired between

IDT and Faus, in which Faus' upcoming contract with Home Depot was discussed, as well

as a possible partnership between the two companies, and Faus made further statements

regarding a possible merger (*Id*. ¶ 12).

(3)     At some time before the Agreement was executed in January of 2006, Faus

provided IDT with forecasted projections, which represented that Faus expected to order

1,630,016 FasTrim units and 2,353,341 quarter round units from IDT in 2006, which, based

on the price terms that ultimately were included in the Agreement, would have equated to

approximately $19 million in projected revenue for IDT in that year (*Id*. ¶ 18).

---

[6]  A plaintiff cannot simply "cry fraud" and thereby escape dismissal at the pleadings stage,
or on summary judgment.  *Cf. Strum*, 15 F.3d at 332 (fraud claim dismissed based in part on Fed.
R. Civ. P. 9(b) and its North Carolina counterpart, N.C. Gen Stat. § 1A-1, Rule 9(b)).  The Court
notes this seemingly obvious rule of law only because the issue of whether Rule 9 applies at the
summary judgment stage has been raised in this case; in particular, Plaintiff has argued that Faus
failed to raise the issue at the pleadings stage, and thus waived it.  While *Strum* does not speak to
issue of waiver directly, the Court finds its construction and usage of Rule 9 to be instructive.  In
any event, whether phrased as a question of the sufficiency of Plaintiff's pleadings (which may or may
not have been technically waived), or the sufficiency of its proof, the Court concludes that in order
to survive dismissal at this stage, Plaintiff must plead and show sufficient evidence in support of its
fraud claims with the level of detail required by both the federal rules and North Carolina's
substantive law.

(4)    In December, 2005, Faus finalized a contract with Home Depot which required Home Depot to purchase a certain dollar amount of either laminate or wood molding, but which contained no specific requirement that Home Depot purchase any set amount of wood molding (*Id*. ¶ 17).

(5)    In December, 2005, Juan Flores ("Mr. Flores"), the President of Faus, told John Damrell ("Mr. Damrell"), the President of IDT, that "Home Depot had a commitment to buy a fixed amount of wood moldings from Faus" (*Id*. ¶ 17).

(6)    In December, 2005, Mr. Flores and Dan Snapper ("Mr. Snapper"), another Faus employee, told Mr. Damrell and Tom Laitala ("Mr. Laitala"), the treasurer of IDT, that while they "could not disclose the exact amount of Home Depot's wood molding commitment, it was more than sufficient to support the 2006 wood molding forecast that Faus had provided to IDT," indeed, Mr. Flores told them that the projected numbers were "half of what [IDT] should expect" (*Id*. ¶¶ 17, 18).

(7)    In December of 2005, Mr. Flores and Mr. Snapper also told Mr. Damrell and Laitala that the forecasts they had provided to IDT were "based on information provided by Home Depot to Faus"; however, Home Depot stated that it did not provide any information to Faus, which could support those projections  (*Id*. ¶ 17).

(8)    Based upon these statements and the "size of the anticipated contract between IDT and Faus," which was the "main incentive and reason IDT built its North Carolina

-12-

plant," IDT proceeded ahead with construction of its Graham, North Carolina plant and entered into the Agreement (*Id.* ¶¶ 13, 17).

(9)     Had IDT known that Faus did not have a "firm commitment" from Home Depot to buy a specific amount of wood molding, or that the forecasts it had received were not based on information provided by Home Depot, it would not have entered into the Agreement or built its new plant (*Id.* ¶ 17).

(10)     Both before and after the Agreement was signed on January 25, 2006, IDT relied on the projected figures supplied to it by Faus "to plan its business, including arranging for and contracting with wood suppliers, ordering inventory, purchasing equipment, obtaining bank loans and building its North Carolina plant" (*Id.* ¶¶ 14, 18-19).

(11)     Notwithstanding the fact that it had already provided IDT with projected figures on which it could base its business plan, Mr. Flores "continually represented" that IDT must make certain that it had enough raw materials and kept inventories high so that Faus would suffer no delays in shipping the finished goods to Home Depot (*Id.* ¶ 21).

(12)     For an approximately 10-month period following the execution of the Agreement, ending in November of 2006, the parties conducted business relatively smoothly, with Mr. Flores making repeated requests to keep inventory high, so that Faus could meet Home Depot's requirements, and continued talks of a possible merger (at one point a contingent offer was even put on the table) (*Id.* ¶¶ 21-28).

(13)    The 2006 forecast supplied to IDT, was "horribly off target" because the person who prepared it had "no experience" with such calculations and used an unsound methodology, as evidenced by the fact that only 52% of the orders projected for that year were actually placed (*Id*. ¶ 20).

(14)    On December 4, 2006, Faus sought to cancel existing purchase orders, delay delivery of other purchase orders and refused delivery of certain finished goods manufactured pursuant to other orders (*Id*. ¶ 29).

(15)    In December, 2006, Faus revealed, for the first time, that its Home Depot contract was not going as well as anticipated, even though IDT maintains that Faus knew for months that Home Depot's orders were off target (*Id*.).

(16)    By April 12, 2007, numerous disputes had arisen between IDT and Faus regarding purchases orders and a growing inventory of finished goods and raw materials, at which point Mr. Flores told Mr. Damrell that he should not "lose sight of where the companies were going," that Faus would soon have other customers that "would be bigger than Home Depot," and that IDT needed to forge ahead so that Faus could purchase it (*Id*. ¶¶ 29-31).

(17)    Faus did not have any real desire to purchase IDT, and that Mr. Flores made the above statements merely to secure an agreement whereby IDT would continue to order inventory, while at the same time acquiescing to Faus' requests for modifications and/or cancellations of existing purchase orders, which it ultimately secured (*Id*. ¶ 31).

-14-

(18)    On June 20, 2007, Mr. Damrell told Mr. Flores that IDT's cash situation had become "critical," and Mr. Flores told Mr. Damrell that Faus would acquire IDT very soon and that IDT's excess inventory would be "taken care of" (*Id.* ¶ 32).

(19)    Throughout the summer of 2007, the relationship between IDT and Faus continued to deteriorate until, on September 24, 2007, Mr. Flores received a directive from his superior in Spain to withhold all payments to IDT until IDT agreed to certain of Faus' demands (*Id.* ¶¶ 32-36).

## 1.    Fraud

Plaintiff has pled two separate fraud claims which allege various violations, both prior to and after the execution of the Agreement, which have been styled as claims for "Fraud in the Inducement," and "Fraudulent Misrepresentations," respectively. Even though the nomenclature used by Plaintiff appears to signal some meaningful distinction between the two causes of action, the Court notes that the essential elements of both are the same.

Indeed, "[w]hile fraud has no all-embracing definition" under North Carolina law, it is clear that the following elements must be established before relief may be granted: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with the intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568-69, 374 S.E.2d 385 (1988) (emphasis removed) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494 (1974) (Fraud "is better left undefined lest crafty men find a way of

committing fraud which avoids the definition."). Additionally, "any reliance on the allegedly false representations must be reasonable." *See, e.g., Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382 (2007) (citing *Johnson v. Owens*, 263 N.C. 754, 757, 140 S.E.2d 311 (1965)).

Beginning with IDT's "fraud in the inducement" claim, which is derived mainly from Plaintiff's allegations that Faus misrepresented that it had "contractual commitments" from Home Depot to purchase wood molding that were sufficient to support Faus' projections, and that the projections Faus had submitted were based on figures provided to Faus by Home Depot (*see* Docket No. 59, Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. ("Pl.'s Resp. Br.") at 7-8.), the Court finds that, when viewed in a light most favorable to Plaintiff, and affording it all reasonable inferences that may be drawn from the evidence submitted, the record before the Court raises questions of material fact which necessitate a trial.

It is clear from the record that Faus did endeavor to discuss its relationship with Home Depot, at least to some extent, with IDT; therefore, it had a duty to be honest and forthcoming in those discussions. *See generally Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172, N.C. App. 427, 437, 617 S.E.2d 664 (2005). Moreover, the exhibits cited by Plaintiff do generally raise an inference that Faus or its representatives may have inaccurately conveyed certain facts about that relationship to IDT. (*See* Pl.'s Resp. Br., Ex. 1, Deposition of Tom Laitala ("Laitala Dep.") at 10:25-12:21; Ex. 3, Deposition of Steven A. Coppenger ("Coppenger Dep.") at 29:21-30:4; Ex. 9, Deposition of IDT's Rule 30(b)(6) witness (Tom Laitala) ("IDT's 30(b)(6) Dep.") at 62:17-64:20; Ex. 8, Deposition

-16-

of John Damrell ("Damrell Dep.") at 64:14-65:1, 66:6-69:10; Ex. 10, Mar. 10, 2006 Email

of Tom Laitala; Ex. 11, Contract between Faus and Home Depot ¶ 3.)

While IDT's evidence provides only spare information regarding the actual alleged

misrepresentations (i.e., dates, times, language used, etc.), and provides no direct evidence

concerning the knowledge and state of mind of the speaker of said utterances, the Court finds

it sufficient to stave off summary judgment. *See, e.g., Allen v. Roberts Constr. Co.,* 138 N.C.

App. 557, 568, 532 S.E.2d 534 (2000) (plaintiff must show defendant had actual knowledge

of false representation, but may use circumstantial evidence to do so).

Based on the record, the Court finds that a reasonable juror could *possibly* find enough

evidence to establish an actionable claim for fraud in the inducement. *See generally Forbis*,

361 N.C. at 527-28 (holding that the same set of facts which created a triable issue in relation

to whether a "false representation or concealment of a material fact" could be established

also created triable issues of fact regarding the remaining elements of fraud); *but cf. Myers

& Chapman*, 323 N.C. at 568-69 ("The term 'scienter' embraces both knowledge [of falsity]

*and* an intent to deceive," and without some proof of both, the required state of mind for

fraud "is not present") ("disavow[ing]" any cases which "only implicitly recognize[]" the

"essential element" of scienter in a fraud claim.) (citations omitted) (emphasis added); *Media

Network, Inc., v. Long Haymes Carr, Inc.*, ____ N.C. App. ____, ____, 678 S.E.2d 671, 683

-17-

(2009) ("Tort actions for deceit or fraud require showing intent to deceive or scienter, which [is] [a] heavy burden[] of proof.") (citation omitted).[7]

Faus has voiced concern over the prospective and contractually non-binding nature of the projections that it submitted to IDT. However, *before* the execution of the Agreement (and the concurrent undertaking of contractual obligations), those projections served another purpose: namely, to induce IDT to build a plant in North Carolina and to enter into the Agreement. Indeed, to the extent Faus' projections were presented to IDT along with a contemporaneous representation that Faus' contract with Home Depot would be sufficient to support them, as IDT alleges, they fairly could be viewed by IDT not only as a prospective glimpse at potential future business, but also as a statement of the scope and magnitude of Faus' contract with Home Depot, a past or then-existing fact.[8]

There remains, of course, the issue of IDT's reliance on Faus' communications. Faus has called into question whether the reliance alleged by IDT could be justifiable as a matter

---

[7] The Court notes that *Myers & Chapman*, which dismissed a fraud claim based on a lack of scienter, is distinguishable from the present case in that it was decided on a post-trial motion, not a motion for summary judgment, and because that case involved a jury's verdict sheet, which specifically found that the defendant did not have knowledge that his conduct was fraudulent.

[8] The Court recognizes that statements of opinion generally do not give rise to fraud claims, *see Hall v. T.L. Kemp Jewelry, Inc.*, 71 N.C. App. 101, 322 S.E.2d 7, 11 (1984) (opinion as to an item's value did not constitute fraud), and that an argument could be made in favor of finding Faus' statement that its Home Depot contract could support its contract with IDT to be just that. However, "a statement purporting to be an opinion may be the basis for fraud if, at the time it is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." *See, e.g., Leftwich v. Gaines*, 134 N.C. App. 502, 508-09, 521 S.E.2d 717 (1999). Further, a jury should typically decide whether a statement is one of fact or opinion, and whether or not it was intended by its speaker to deceive. *See id.*

-18-

of law. However, even in light of certain testimony elicited from high ranking members of IDT, which, in essence, characterizes certain representatives of Faus (and many people in the industry as a whole) as "blowhards" who are prone to exaggerations and who are not necessarily trustworthy (*See* Damrell Dep. at 63:5-12), the Court cannot say, as a matter of law, that the reasonableness of Plaintiff's reliance, or lack thereof, is so straight forward that it should not be decided by a jury. *See generally Forbis*, 361 N.C. at 527 ("The reasonableness of a party's reliance is [generally] a question for the jury . . . .") (citations omitted).

Accordingly, Defendant's motion for summary judgement must be **DENIED** as to Plaintiff's claim for fraud in the inducement.[9] *But cf. Strum*, 15 F.3d at 330-31 (Rejecting a

---

[9] The Court notes that some of IDT's theories of recovery have survived by only the narrowest of margins. The following exchange, between Mr. Damrell and counsel for Faus illustrates one such "soft spot":

> Q:      But did Faus tell you that, for example, Home Depot has agreed to purchase form Faus [a specific dollar amount] of wood molding?

> A:      Yes, I mean Juan Flores told me it was a - - it was a huge number. Whatever the number was back then it was - - you know, Home Depot was going to do - - *I don't know if he said Home Depot has agreed to purchase [a specific dollar amount]*. But Home Depot has given us all this *business*, and here's how much *business* its going to be.

(Damrell Dep. at 67:15-69-14.) (Emphasis added.)

Taken at face value, this passage could be seen as negating, at least in part, the false-statement element of Plaintiff's claim; however, this passage alone does not change the fact that a question exists as to exactly what Faus said, and what it meant. Indeed, a juror could still look at the rest of Mr. Damrell's testimony (and the record as a whole) and infer that Faus acted with, at minimum, a conscious or reckless "ignorance of the truth" in its dealings with IDT. *See Myers & Chapman*, 323 N.C. at 567-69 (A jury verdict finding of conscious or reckless "ignorance of the truth" does not establish the element of scienter, but it may be relevant in establishing the element of a fraudulent representation.).

plaintiff's contention that "because issues of motive and intent are difficult to resolve on summary judgment, he deserves an opportunity to have his fraudulent inducement claim presented to a jury.").[10]

Turning now to Plaintiff's claim for fraudulent misrepresentation, which focuses on events that allegedly transpired after the execution of the Agreement, the Court finds this claim to be lacking and fatally flawed. In essence, Plaintiff's claim can be divided into two parts: (1) that Faus "tricked" it into building up inventories of raw materials without submitting corresponding purchase orders, based on misleading statements regarding its relationship with Home Depot; and (2) that Faus induced it to change or cancel purchase orders and delay shipments by promising to "take care of" existing inventories and/or by alluding to a potential merger. (*See generally* Pl.'s Resp. Br. at 8-9.) Based on the summary judgment record before it, the Court concludes that neither theory is viable.

With regard to its first theory of fraud, Plaintiff has failed to create a triable issue of material fact. The testimony of Mr. Damrell and Mr. Laitala indicates only that Faus requested that IDT continue to order materials and build its inventory; their testimony does not bear out Plaintiff's allegation that Faus affirmatively led IDT to believe its contract with Home Depot was going well, when in fact it was not. (*See* Damrell Dep. at 56:16-57:20;

---

[10] As illustrated *infra*, the fraudulent inducement claim in *Strum* is distinguishable from Plaintiff's similarly-styled claim because *Strum* dealt with a representation by the defendant that it would do something in the future, which promise was solemnized as an actual contract term, and subsequently breached; it did not deal with an alleged false statement concerning a past or then-existing fact (i.e., the terms of the Home Depot contract, or the origin of the data used to generate Faus' projections), which was not made part of the parties' agreement, as is the case here.

Laitala Dep. at 43:18-44:10, 50:5-51:16.) Indeed, the testimony of these two gentlemen is silent on this later point. Accordingly, IDT's first theory of fraud fails as IDT has not shown an actual false statement, let alone evidence from which scienter could be inferred.[11]

Moreover, it is clear that any harm IDT may have suffered was not directly attributable to this alleged fraud. As Mr. Laitala's testimony makes clear, Faus eventually did place purchase orders to support the raw materials that it had allegedly "induced" IDT to order; however, those orders were "canceled" soon thereafter. (Laitala Dep. at 51:13-16.) In short, Plaintiff's own testimony shows that any injury IDT may have suffered resulted directly from an asserted breach of contract, rather than from fraud. This fact is significant not only because it negates, at least in part, an essential element of IDT's fraud claim, i.e., harm, but because it also changes the essential character of the claim.

Plaintiff's first theory of its claim for fraudulent misrepresentation ultimately must fail because it is really one for a simple breach of contract, and is therefore not actionable as an

---

[11]As far as this fraud claim goes, whatever assumptions IDT may have made about Faus' relationship with Home Depot are entirely on Plaintiff. Plainly put, Faus' requests that IDT keep inventory high (ostensibly so that it could have a short turn-around time in filling Home Depot's orders) do not constitute "representations" that are actionable in fraud, and IDT cannot turn them into representations by stating its own assumptions about what Faus' requests may have meant. Moreover, as the cited passages do not even show that Faus endeavored to speak in general terms about the ongoing health of its relationship with Home Depot, the Court does not consider this to be an actionable omission, as IDT has not established any specific duty to disclose on Faus' part. In any event, even if the Court could infer that Faus somehow recklessly or consciously ignored the truth, thereby *possibly* establishing a misrepresentation, that alone does begin to carry IDT's "heavy" burden of establishing scienter in this instance, and there is virtually no other evidence from which such an inference could be drawn. *See generally Strum*, 15 F.3d at 330-31 (plaintiff cannot simply "cry fraud" and escape summary judgment) (the simple fact that issues of motive are difficult to prove does not entitle a claimant to have his case presented to a jury).

independent tort. *See, e.g., Strum*, 15 F.3d at 330-31 (interpreting and applying North Carolina law); *see also Broussard,* 155 F.3d at 345-347 ("[I]n order to keep open-ended tort damages from distorting contractual relations, North Carolina has recognized an 'independent tort' arising out of breach of contract only in 'carefully circumscribed' circumstances.") ("Parties contract partly to minimize their future risks. Importing tort law principles of punishment into contract[s] undermines th[at] ability.")

As the Fourth Circuit has previously found, in order to be separately actionable, this kind of allegedly tortious conduct, arising out of an alleged breach of contract, must be "identifiable" as an independent tort, and must be accompanied by sufficient aggravating circumstances. *Strum*, 15 F.3d at 330-31. In other words, the alleged conduct must involve something more than merely failing to carry out pre-existing contractual obligations, and it must also have an element of malice, recklessness or some similarly culpable state of mind in order to justify an award of punitive damages. *Id*.

IDT has failed to adduce proof that would allow this tort claim to stand independent from its contract claims, or of any aggravating factors, which are necessary under *Strum* and *Broussard*. Accordingly, because the "crux of this matter is and always has been a contract dispute," IDT may only seek relief based on the underlying contractual relationship. *See Broussard*, 155 F.3d at 346.

-22-

Along this same line, Plaintiff's second theory of its claim for fraudulent misrepresentation, i.e., that it was duped into altering shipping schedules and/or forging certain contractual rights by Faus' promise to "take care of" existing inventory and/or the possibility of merger between the two companies, must likewise fail. In addition to a failing to make a sufficient evidentiary showing of the elements of a fraud claim, this second theory of liability for fraudulent misrepresentation also runs afoul of the teaching of *Strum* and *Broussard*.

First, IDT's amended pleadings do not state with any particularity the exact harm it allegedly suffered as a result of Faus' representations that it would "take care of" Plaintiff's existing inventory, or eventually merge with IDT, in a way that could show any damages that were not purely contractual in nature, as is ultimately necessary to establish an independent, identifiable tort under *Strum* and *Broussard*. (*Cf.* Rule 9 Amend. ¶¶ 29-31.) IDT alleges that Mr. Damrell met with Mr. Flores on or about April 12, 2007, at which time Mr. Flores made statements concerning a potential merger and/or IDT's excess inventory problem. (*Id.* ¶ 31.) This much of Plaintiff's claim is sufficiently pled pursuant to Rule 9 and supported by enough evidence under Rule 56 review; however, there remains a glaring hole in both Plaintiff's pleadings and its proof: at no point does Plaintiff *explicitly* state or show how it relied on these statements, or how it was damaged by them.

Plaintiff has vaguely alleged that "[b]ased on these representations by Flores, IDT continued to perform under the Supply Agreement and agreed to order extra inventory and

cancel or change purchase orders and was damage[d] as a result of foregoing contractual rights and ordering inventory that Faus ultimately refused to purchase." (*Id*.) Nonetheless, on summary judgment review, this vague and generalized assertion will not carry the day, and Plaintiff has failed to point to evidence of a single instance where it actually modified or cancelled a confirmed purchase order based on those specific statements. Thus, Plaintiff has failed to establish that it was in fact deceived by Faus, or that it was damaged by said deception, both of which are essential elements under North Carolina law. *See, e.g., Ragsdale*, 286 N.C. at 138 (listing elements of fraud). Accordingly, the Court concludes that IDT's second theory of its fraudulent misrepresentation claim is deficient.[12]

Further, the Court questions whether IDT has sufficiently shown that Faus made a false representation, at least insofar as its claim is based on a theory that Faus would "take care of" IDT's inventory. While North Carolina law generally does not recognize a claim for fraud based on statements of this sort, i.e., statements concerning future occurrences, such a claim may be viable it if can be shown that, at the time the statement was made, the promisor had an "intent to deceive the promisee," and that he had no intention of ever fulfilling his promise. *See, e.g., Leftwich*, 134 N.C. App. at 508 (affirming fraud claim based

---

[12] The Court need not make a finding as to whether or not Plaintiff's claim fails on the basis of Rule 9, because, in any event, it fails to pass Rule 56 muster. With that said, the Court notes the lack of particularity in Plaintiff's broad assertion that "IDT continued to perform under the Supply Agreement and agreed to order extra inventory and cancel or change purchase orders and was damaged as a result." The vague assertions related to this particular claim do not put Faus on fair notice of how it is that Plaintiff plans to show certain elements of its claim.

-24-

on "promissory misrepresentation"). Implicit in this rule is the idea that the promise made was not ultimately kept.

Here, it is clear that in April 2007, "Faus agreed to issue eight purchase orders for the products [IDT had] on hand," i.e., Plaintiff's then-existing inventory. (Rule 9 Amend. ¶ 29.) Accordingly, it would seem that a strong argument could be made by Faus that it fulfilled its promise to "take care of" IDT's inventory, thereby negating essential elements of fraud. Moreover, by this time in the relationship between the parties, IDT was well aware that Faus' contract with Home Depot was not going well and that IDT would have to "'share the pain.'" (Rule 9 Amend. ¶ 29.) Under its own pleadings, IDT has negated reasonable reliance on alleged assurances by Faus to "take care" of all the product that IDT produced.

Further, under the allegations of the amended pleadings, Faus' promise to take care of inventory was solemnized by a contractual undertaking (i.e., the issuance of purchase orders). As was the case with Plaintiff's first theory of its claim, this fact ultimately changes the essential character of Plaintiff's second theory of fraud as well, and ultimately brings this portion of Plaintiff's claim within the scope of *Strum* and *Broussard*, as discussed above. Once again, the Court views any harm Plaintiff may have suffered as being purely contractual in nature. Moreover, Plaintiff has again failed to allege adequate facts to enable this claim to stand on its own as an independent, identifiable tort, let alone established the requisite aggravating circumstances which would allow such a claim to be pled separately.

-25-

While it may not be theoretically impossible for a plaintiff to allege that it was fraudulently induced into foregoing existing contractual rights in such a way as to distinguish itself from *Strum* and *Broussard*, the facts of this case, based on the record before the Court, simply do not present such a case. Thus, the Court concludes that Faus' motion for partial summary judgment should be **GRANTED** as it relates to IDT's fraudulent misrepresentation claims.

### 2.     Negligent Misrepresentations

In order to prove a claim for negligent misrepresentation, IDT must show that: (1) Faus failed to exercise due care in obtaining and communicating information to IDT that IDT was justified in expecting; and (2) IDT was injured by its justifiable reliance on said information. *See Davidson & Jones, Inc., v. New Hanover County*, 41 N.C. App. 661, 255 S.E.2d 580 (1979) (adopting definition found in the Restatements of Torts). Moreover, similar to its claim for fraudulent misrepresentation, discussed above, Plaintiff must also show that its negligent misrepresentation claim is actually an independent, identifiable tort, separate and apart from its contract claims. *See, e.g., N.C. Mut. Life. Ins. Co. v. McKinley Fin. Servs. Inc.*, No. 1:03CV00911, 2005 WL 3527050, at *8-9 (M.D.N.C. Dec. 22, 2005) (Tilley, C.J.) (dismissing negligent misrepresentation claim based on *Strum* and *Broussard* because claims did not arise from "distinct" circumstances) (some level of aggravation must be shown, but it need not necessarily be malice or recklessness) (citations omitted).

On review, the Court finds that the factual allegations and evidentiary showings underlying Plaintiff's fraud in the inducement claim could form the basis for a negligent misrepresentation cause of action. *Cf. Myers & Chapman,* discussed *supra* (finding that the same conduct which failed to support a fraud claim could support a claim for gross negligence). Indeed, a reasonable juror could possibly view Faus' statements to IDT prior to the execution of the Agreement, which concerned its contract with Home Depot, as negligent communications, especially given the confidential nature of Faus' relationship with Home Depot. The same could be said of Faus' preparation and dissemination of the 2006 projections to IDT, as well as certain statements that Faus made relating to those forecasts. On the other hand, to the extent Plaintiff's negligent misrepresentation claim is based on the same facts as its theories of recovery for fraudulent misrepresentation after contract formation, discussed above, which were barred by *Strum* and *Broussard*, the Court finds that those theories of recovery likewise must fail when styled as a claim for negligent misrepresentation.

Accordingly, for the reasons stated above, the Court concludes that Defendant's motion for partial summary judgment should be **GRANTED** in part and **DENIED** in part, as set forth above, insofar as the motion relates to Plaintiff's negligent misrepresentation claim.

Case 1:07-cv-00781-PTS   Document 78   Filed 10/06/09   Page 27 of 31

### 3.    Unfair and Deceptive Trade Practice Claims

Along the same divide, the Court concludes that certain theories of Plaintiff's Unfair and Deceptive Trade Practice ("UDTP") claim should be presented to a jury, while certain others should not.   As the Fourth Circuit stated in *Broussard*, a UDTP claim cannot "piggyback" on a breach of contract action any more than a fraud or negligence claim can, even where the underlying breach of contract was clearly intentional.  *Broussard*, 155 F.3d at 347 (Remanding UDTP claim to district court with instructions to consider *Strum's* observation that: "We think it unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations.") (citation omitted).

Here, among other things, Plaintiff has alleged that Faus committed an unfair and/or deceptive trade practice when it allegedly withheld payment on currently due invoices, in an effort to, as IDT puts it, force Plaintiff into coming to an agreement with Faus regarding other disputed invoices.  However, regardless of Faus' subjective motives, the Court views these allegations as stating nothing more than a claim for breach of contract, and, in any event, they certainly do not point to the sort of "*substantial* aggravating circumstances," that are necessary to transform such a claim into an independently actionable tort.  *Id*. (citing *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 418 S.E.2d 694 (1992)

-28-

(adopting UDTP interpretation found in *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530 (4th Cir. 1989)) (emphasis added).

Accordingly, Faus is entitled to summary judgment on Plaintiff's UDTP claim to the extent that it is based on this particular theory of recovery or any of the other theories discussed above which the Court has previously found do not implicate an independent, identifiable tort. However, this does not end the Court's analysis of Plaintiff's UDTP claim, as there is also a question as to whether or not Faus' conduct that pre-dated the execution of the Agreement is actionable as a UDTP claim.

In point of fact, the same pre-Agreement conduct which the Court found to be actionable as a fraud-in-the-inducement and/or negligent misrepresentation likewise appears to be actionable as an unfair and/or deceptive trade practice. *See generally Media Network*, 678 S.E.2d at 683- 85 (claim sounding in "fraud in the inducement" was actionable as an unfair and deceptive trade practice) (intent of defendant is irrelevant) (contributory negligence, commercial bribery and other similar defenses are inapplicable to UDTP claims). Indeed, for reasons stated above, the Court finds that a material question of fact exists as to whether Faus' pre-Agreement conduct and statements possess the "tendency or capacity to mislead, or create[] the likelihood of deception." *See id*. at 683. Accordingly, Faus is not entitled to summary judgment on Plaintiff's UDTP claim to the extent it relates to the

-29-

aforementioned pre-Agreement conduct.[13, 14]

## CONCLUSION AND ORDERS

For the foregoing reasons, **IT IS ORDERED** that Plaintiff's motion for partial summary judgment (Docket No. 44) be **GRANTED** as to goods received and accepted by Defendant, with judgment to be entered on this claim at the end of the case in the amount of $588,482.30, as well as appropriate contractual interest and penalties, and **DENIED** as to Plaintiff's remaining contract claims. **IT IS FURTHER ORDERED** that Defendant's motion for partial summary judgement (Docket No. 49) be **DENIED** as it relates to Plaintiff's contract claims, **DENIED** as it relates to Plaintiff's fraud in the inducement claim, and **GRANTED** in part, and **DENIED** in part, as it relates to Plaintiff's fraudulent

---

[13] The Court rejects Faus' argument that the Agreement's merger clause somehow prevents IDT from succeeding on its tort claims. *See generally Zinn v. Walker*, 87 N.C. App. 325, 333, 361 S.E.2d 314 (1987) (Merger clauses are recognized and upheld to the extent they effectuate the policies of the parol evidence rule, they are not a *per se* bar to claims where a plaintiff has raised questions of fact relating to fraud, bad faith, negligent omission, mistake of fact or unconscionability.); *cf. Media Network*, 678 S.E.2d. at 684 (merger clause defense did not bar plaintiff's UDTP claim).

[14] As a final matter, the Court notes that the parties may have inadvertently misspoken when they represented that there were not any outcome-determinative choice-of-law issues in this case, which representation led the Court to hold choice-of-law issues in abeyance until the parties submitted a stipulation and/or statements of position. Based on briefing, it would seem that at least one of IDT's claims may rise or fall based on the body of law the Court applies. In point of fact, Defendant's brief tends to indicate that Georgia's unfair and deceptive trade practice law is much narrower than North Carolina's, in that the former allows only claims affecting consumers, whereas the latter examines whether conduct has an effect on commerce, which, it would seem, is a broader universe. Without passing on the propriety of their characterizations of each state's respective laws, the Court notes this observation merely to alert the parties to the possible existence of a significant issue which has not yet been fully explored. To the extent the parties now believe that choice-of-law issues may be dispositive, the Court will revisit this issue at trial, and the matter should be addressed in trial briefs.

misrepresentation, negligent misrepresentation and UDTP claims, respectively, as stated in this opinion. Finally, **IT IS ORDERED** that the parties proceed with final pretrial preparations in a timely manner.

The trial date is established as January 11, 2010, and the parties shall appear in Courtroom 1A , Greensboro, at 9:30 a.m. on that date. The jury will be summonsed for January 12, 2010, to allow the Court to conduct a final pretrial conference with the parties on January 11.


_____
/s/ P. Trevor Sharp
United States Magistrate Judge


Date: October 6, 2009